UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| MONICA STEELE, | ) | |
| | ) | |
| **Plaintiff**, | ) | |
| | ) | |
| v. | ) | No. 2:18-CV-102 PLC |
| | ) | |
| KILOLO KIJAKAZI,[1] | ) | |
| **Acting Commissioner Social Security,** | ) | |
| | ) | |
| | ) | |
| **Defendant**. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Monica Steele seeks review of the decision of Defendant Acting Social Security Commissioner Kilolo Kijakazi denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).  For the reasons set forth below, the Court affirms the Commissioner's decision.

## I.        Background and Procedural History

Plaintiff, who was born April 1991, filed applications for DIB and SSI in September 2015 alleging that, as of August 26, 2015, she was disabled as a result of:  depression, anxiety, pseudotumor cerebri, migraines, pacemaker, back pain, bipolar II disorder, and idiopathic thrombocytopenic purpura.  (Tr. 167, 258-59, 260-68)  The Social Security Administration (SSA) denied Plaintiff's claims in April 2016, and she filed a timely request for a hearing before an administrative law judge (ALJ).  (Tr. 189-94, 197)  In December 2017, an ALJ conducted a hearing at which Plaintiff and a vocational expert testified.  (Tr. 91-146)

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted, therefore, for Andrew Saul as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

In a decision dated May 14, 2018, the ALJ determined that Plaintiff "has not been under a disability, as defined in the Social Security Act, from August 26, 2014, through the date of this decision[.]"  (Tr. 16-35)  Plaintiff subsequently filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review.  (Tr. 1-7, 251-54)  Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.   Evidence Before the ALJ

### A.  Plaintiff's testimony

Plaintiff testified that she was twenty-six years old, five feet four inches tall, and 220 pounds, and she had a high school education and "a couple semesters of college."  (Tr. 91, 106) Plaintiff lived with her seventeen-month-old daughter.  (Tr. 102)

Plaintiff most recently worked as a "lab tech" in a dermatologist's office, where she collected, processed, and recorded specimens.  (Tr. 91-92)  Plaintiff stated that her employment ended in August 2015 when she "went on medical leave" on the advice of her primary care physician and therapist because "if not, I was going to have a mental breakdown."  (Tr. 106) Plaintiff also had previous experience working with "the mentally handicapped" at Specialized Support Services, as a CNA at Kirksville Manor, and a crew member at Burger King.  (Tr. 92-94)

Plaintiff testified that she suffered migraines with photosensitivity, "flashes of light," and "tunnel vision" three to four times per week.  (Tr. 107)  Plaintiff's migraines occurred randomly and lasted eight to ten hours.  (Tr. 108)  During a typical migraine, Plaintiff would lie down in the dark three or four times for twenty to forty minutes at a time.  (Tr. 108-09)  Plaintiff also experienced dizziness "[a]bout twice a week," which lasted about five minutes and required her to lie down.  (Tr. 110)  Plaintiff testified that her dizziness was triggered by "[o]verexertion, if I do

stuff too fast … like pick up after my child … or try to sweep." (Tr. 111)  Plaintiff recently "came close to passing out," had not actually fainted since receiving her pacemaker in April 2017.  (Tr. 111-12)  Along with the migraines and dizziness, Plaintiff experienced "double vision, blurriness" twice a week for two to five minutes.  (Tr. 116-17)

Plaintiff stated that she had been experiencing TMJ for four years, and it caused her "sharp pain … like somebody hit me in the side of the jaw" and "popping …like a piece of wood snapping." (Tr. 112-13, 115)  Plaintiff likened the pain to "when you get hit in the head with a toy or a hammer," and she testified that the pain occurred eight times per day and lasted "about 2 minutes." (Tr. 113-14)  Plaintiff also complained of "ringing in her [her] ears," that sounded like "locusts, ringing like a school bell … sometimes, like, my heart beat…." (Tr. 115)  The problem was worse in her right ear and constant.  (Tr. 115-16)

Plaintiff testified that she had thoracic outlet syndrome that caused pain "[f]rom [her] neck down … shoulders, mid back, hip, and tailbone … below the hip." (Tr. 117)   The pain in her shoulders produced numbness and tingling in her arms and hands about three times per day lasting an hour at a time.  (Tr. 117-18)  Plaintiff described a pins-and-needles sensation in her right hand, and a less painful numbness in her left forearm and hand.  (Tr. 118)  Her middle and lower back pain was "constant" and radiated to both hips "like, a wave, like shooting down… about daily" for "eight to ten hours of the day." (Tr. 121-22)  Plaintiff stated that hot baths, heating pads, and lying down helped her back pain.  (Tr. 122)

Plaintiff described pain from her pacemaker, explaining that when it "turn[s] on … it thumps … against my chest…. It's sharp, and it tends to get sharp, and that's all I pretty much focus on when it happens." (Tr. 119)  Plaintiff noted that this occurred "[e]very two weeks" and

3

lasted for forty-five minutes.  (Tr. 120)  Plaintiff also experienced "sharp pains in the center of [her] chest" weekly, lasting about ten minutes.  (Tr. 121)

When asked about her mental health, Plaintiff stated that she been diagnosed with bipolar II, anxiety, depression, and PTSD.  (Tr. 125)  Plaintiff advised that her doctors believed she was depressed, but she expressed doubt stating, "I don't want to kill myself."  (Tr. 126)  Plaintiff suffered panic attacks "two to three times a week," during which she "can't breathe, chest – it feels like somebody's sitting on [her] chest, sometimes crying," and they lasted five to fifteen minutes.  (Tr. 127)  After a panic attack, Plaintiff felt "drained, exhausted" and estimated that it took "a couple hours" for her to recover.  (Tr. 127)  Plaintiff experienced weekly flashbacks of her "abusive [childhood] home" and a workplace sexual assault.  (Tr. 128)

Plaintiff stated she had been seeing her psychiatrist Dr. Elder since May or June.  Before starting treatment with Dr. Elder, Plaintiff saw Dr. Cummins and, prior to that, she worked with therapist Tracy Parks.  (Tr. 124-25)  At the time of her hearing, Plaintiff's medications included venlafaxine, Buspar, clonidine, fentanyl, methylphenidate, and Nature-Throid.  (Tr. 95)

The ALJ questioned Plaintiff about road trips she had taken in the previous two years to Freeport, Illinois and Oklahoma to visit family and friends.  (Tr. 96)  In Oklahoma, Plaintiff's "friends rode … their RZRs and four-wheelers," but Plaintiff "didn't participate because it hurt." (Id.)  During the travel, Plaintiff rode in the passenger seat of her boyfriend's four-door truck, and "would sit or lay or maneuver where [she] would get comfortable."  (Tr. 98-99)  Plaintiff estimated that the drive to Oklahoma was five to six hours and they made six fifteen- to twenty-minute stops. (Tr. 99-100)

In regard to her activities of daily living, Plaintiff stated she would lie down "[o]n the floor, in bed, the couch" for about four hours per day.  (Tr. 122-23)  When the ALJ asked whether she

was able to hold her daughter, Plaintiff stated, "[N]ot really…. I do but I hurt or I sit down."  (Tr. 97)  When caring for her daughter, Plaintiff would "lay down on the floor and play with her…. Mainly just … watch her.  She does a lot of independent stuff."  (Tr. 123)

Plaintiff required help with cooking, cleaning, laundry, and childcare.  (Tr. 97)  Plaintiff's mother helped Plaintiff with these activities "at least three times a week," and occasionally took Plaintiff's daughter to her house for "a couple hours … if I'm hurting so bad and nothing is helping."  (Tr. 103)  Plaintiff stated that her daughter's father's mother and aunt also came over once a week to help Plaintiff with her daughter and sometimes kept the child overnight.  (Tr. 104)  Her daughter's father took care of the child "whenever he's not working on the road," which was usually "once or twice a week" for six to eight hours.  (Tr. 104-15)

Plaintiff was able to comfortably drive a maximum of fifteen miles.  (Tr. 129)  Either Plaintiff's boyfriend grocery shopped or Plaintiff would shop with her mother "at night when there's not very many people around … I lean on the grocery cart."  (Tr. 130)  Plaintiff's boyfriend carried the groceries or she would "wait until [she] can get someone there or drag them or get something to drag them with."  (Id.)  Plaintiff had difficulty putting on a bra and socks and reaching up to wash her hair.  (Tr. 131)  Plaintiff estimated she could sit, stand, or lie down comfortably for about five minutes and walk thirty steps before needing to stop.  (Tr. 132)

### B.  Vocational expert's testimony

The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's age, education, and work history who was capable of light work with the following limitations:

> The individual would never climb ladders, ropes, or scaffolds or be exposed to unprotected heights or hazardous work environments.  They could occasionally climb stairs or ramps; frequently balance; occasionally stoop, kneel, crouch, or crawl; occasionally reach overhead with either upper extremity; and frequently reach in all other directions.  They could frequently engage in tasks that require handling.

They would need to avoid concentrated exposure to extreme cold and extreme heat as well as avoiding concentrated exposure to vibration and to noise above a moderate level…. The hypothetical individual would need to avoid concentrated exposure to bright flashing or flickering light.

They would be limited to remembering and carrying out simple, routine tasks and making simple work-related decisions and could not perform production-pace tasks that require strict hourly goals; could have frequent contact with supervisors and coworkers but only occasional contact with the general public.

(Tr. 138)  The vocational expert testified that such an individual could not perform Plaintiff's past work, but she could perform the jobs of light cleaner or housekeeper, laundry worker, or machine tender.  (Tr. 138-39)

When the ALJ limited the same hypothetical individual to sedentary work, the vocational expert stated the individual would be able to perform the jobs of hand assembler, table worker, and sedentary machine tender.  (Tr. 140)  However, if that same individual were "off task 10 percent of the work day," absent "two or more days per month on an ongoing basis," or needed to lie down a total of two hours in an eight-hour workday, she would not be able to maintain employment.  (Tr. 141-43)

## III.    Standards for Determining Disability Under the Social Security Act

Eligibility for disability benefits under the Social Security Act ("Act") requires a claimant to demonstrate that he or she suffers from a physical or mental disability.  42 U.S.C. § 423(a)(1). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months."  20 C.F.R. §§ 404.1505(a), 416.905(a).  The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy ....” 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. §§ 404.1520(a), 416.920(a).  Those steps require a claimant to first show that he or she is not engaged in substantial gainful activity.  Id.  Second, the claimant must establish that she has a “severe impairment,” defined as “any impairment or combination of impairments which significantly limits [claimant’s] physical or mental ability to do basic work activities.”  20 C.F.R. §§ 404.152(c), 416.920(c).  “The sequential evaluation process may be terminated at step two only when the claimant’s impairment or combination of impairments would have no more than a minimal impact on her ability to work.”  Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quotation omitted).  At step three, the ALJ considers whether the Plaintiff’s impairment meets or equals an impairment listed in 20 C.F.R., Subpart P, Appendix 1.  Id. at 404.1520(d).

Prior to step four, the Commissioner must assess the claimant’s residual functional capacity (RFC), which is “the most a claimant can do despite [his or her] limitations.”  Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)).  At step four, the ALJ determines whether the claimant can return to her past relevant work by comparing the claimant’s RFC with the physical and mental demands of the claimant’s past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f); McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011).  If the claimant can still perform past relevant work, she will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step.  Id.

Through step four, the burden remains with the claimant to prove that he or she is disabled.  Moore, 572 F.3d at 523.  At step five, the burden shifts to the Commissioner to establish that,

given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform.   20 C.F.R §§ 404.1520(g), 416.920(g); Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012).  If the claimant cannot make an adjustment to other work, then she will be found to be disabled.  20 C.F.R. §§ 404.1520(g), 416.920(g).

## IV.    ALJ's Decision

In her decision, the ALJ applied the five-step evaluation set forth in in 20 C.F.R. §§ 404.1520, 416.920.  (Tr. 16-35)  The ALJ determined that Plaintiff:  (1) had not engaged in substantial gainful activity since August 26, 2015; and (2) had the severe impairments of migraines, "status post pacemaker implant with history of cardiogenic syncope," "history of pseudo tumor cereb[r]i," anxiety, depression, PTSD, and bipolar disorder.  (Tr. 18-19)  The ALJ also found that Plaintiff had the non-severe impairments of idiopathic intracranial hypertension,[2] myopia, astigmatism, anisometropia, immune thrombocytopenia affecting pregnancy in the third trimester, hypothyroidism, obesity, and "a history of cephalgia."  (Tr. 19)  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id.)

Based on her review of the record, the ALJ found that Plaintiff's medically determinable impairments "could reasonably be expected to cause the alleged symptoms," but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]"  (Tr. 24)  The ALJ

---

[2] Idiopathic intracranial hypertension is another name for pseudotumor cerebri, which the ALJ deemed a severe impairment.  See www.mayoclinic.org/diseases-conditions/pseudotumor-cerebri/symptoms-causes/syc-20354031.  Last checked March 8, 2022.

thoroughly reviewed and summarized Plaintiff's voluminous medical records and found that, while debilitating, Plaintiff's symptoms did not preclude her from performing a limited range of light work.  In support of her conclusion, the ALJ noted that Plaintiff "has engaged in a somewhat normal level of daily activity and interaction," including "independently caring for an infant" and taking "multiple trips by car to different cities and states with friends."  (Tr. 24-31)

The ALJ determined that Plaintiff had the RFC to perform light work with the following limitations:

> [S]he could never climb ladders, ropes or scaffolds or be exposed to unprotected heights or hazardous work environments.  The claimant could occasionally climb stairs or ramps; frequently balance; occasionally stoop, kneel, crouch or crawl.  She could occasionally reach overhead with either upper extremity, frequently reach in all other directions, and frequently handle.  She should avoid concentrated exposure to extreme cold and extreme heat, as well as to vibration and noise above a moderate level as defined by Appendix D of the Selected Characteristics of Occupations.  In addition, the claimant should avoid concentrated exposure to bright flashing or flickering light.  The claimant is limited to remembering and carrying out simple, routine tasks and making simple work-related decisions.  She cannot perform production pace tasks that require strict hourly goals.  The claimant may have frequent contact with supervisors and coworkers, but only occasional contact with the general public.  She will be off task 5% of [the] workday and needs to sit up to 5 minutes per hour.

(Tr. 22-23)  Based on the vocational expert's testimony, the ALJ concluded that Plaintiff was unable to perform any past relevant work but had the RFC to perform other jobs that existed in significant numbers in the national economy, such as housekeeper, light laundry worker, or light machine tender.  (Tr. 33-35)  The ALJ therefore concluded that Plaintiff was not disabled.  (Tr. 35)

## V.     Discussion

Plaintiff claims that substantial evidence does not support the ALJ's decision.  [ECF No. 18]  Specifically, Plaintiff argues that the ALJ erred in:  (1) failing to give proper weight to the

opinions of Plaintiff's treating physician and treating psychiatrist; and (2) formulating an RFC that was "not supported by any medical opinion." [Id.] The Commissioner counters that the ALJ properly weighed the medical opinions and other evidence when evaluating Plaintiff's RFC. [ECF No. 23]

### A. Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)). A court must consider "both evidence that supports and evidence that detracts from the ALJ's decision, [but it] may not reverse the decision merely because there is substantial evidence support[ing] a contrary outcome." Id. (quoting Prosch, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determination are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)). Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]" Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

### B. Medical Opinion Evidence

Plaintiff claims the ALJ erred in discrediting the opinions of her treating physician, Dr. Bergman, and treating psychiatrist, Dr. Chad Elder. In response, the Commissioner asserts that

the ALJ weighed the medical opinions in accordance with SSA regulations and properly assigned them little weight because they conflicted with other substantial evidence.

"Under the relevant regulations,[3] an ALJ must give a treating physician's opinion controlling weight if it well-supported by medical evidence and not inconsistent with the substantial evidence in the record." Lucus v. Saul, 960 F.3d 1066, 1068 (8th Cir. 2020) (citing 20 C.F.R. § 404.1527(c)(2)). "Even if not entitled to controlling weight, such opinions 'typically are entitled to at least substantial weight, but may be given limited weight if they are conclusory or inconsistent with the record.'" Schwandt v. Berryhill, 926 F.3d 1004, 1011 (8th Cir. 2019) (quoting Julin v. Colvin, 826 F.3d 1082, 1088 (8th Cir. 2016)). This rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians. See 20 C.F.R. §§ 404.1527(c), 416.920c; Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as [a] whole." Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (quoting Pirtle v. Astrue, 479 F.3d 931, 933 (8th Cir. 2007)).

If an ALJ declines to give controlling weight to a treating physician's opinion, the ALJ must consider the following factors in determining the appropriate weight:  length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the

---

[3] For claims filed on or after March 27, 2017, the regulations have been amended to eliminate the treating physician rule. The new regulations provide that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources," but rather, the SSA will consider all medical opinions according to several enumerated factors, the "most important" being supportability and consistency. 20 C.F.R. § 404.1520c. Plaintiff filed her applications in 2015, so the previous regulations apply.

11

source's level of specialization.  20 C.F.R. §§ 404.1527(c), 416.920c.  Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation."  Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)).

**1. Dr. Bergman**

Dr. Bergman began treating Plaintiff for moderate, intermittent neck and middle and lower back pain in November 2016.  (Tr. 1012)  Plaintiff reported that her symptoms were aggravated by bending and lifting, and she also complained of intermittent numbness along her left arm.  (Id.)  Dr. Bergman performed osteopathic manipulative treatment (OMT), which improved her symptoms.  (Tr. 1014)  Later that month, Dr. Bergman noted Plaintiff's continued moderate, persistent back pain, as well as "symptoms of fibromyalgia with sensitivity of the hands and occasional numbness of the feet."  (Tr. 1020)  Plaintiff reported that she "tries to get some exercise by walking regularly."  (Id.)

Dr. Bergman treated Plaintiff and performed OMT once a week in January through May 2017.  (Tr. 939-1006, 1028-52)   In January 2017, Dr. Bergman observed that Plaintiff "responds well to OMT, but has moderate chronic strains and anxieties that hinder the healing process.  She also has a pacemaker for arrythmia and has had complications with the left shoulder and neck."  (Tr. 1036)  In February, Plaintiff reported severe pain, paresthesia of left arm and occasionally left leg, and intermittent tingling in her feet.  (Tr. 1041)  A couple weeks later, Plaintiff stated that OMT reduced her symptoms but they returned within a couple days.  (Tr. 1050)

In early March 2017, Plaintiff's symptoms worsened after she and her boyfriend "drove to IL, 4 hours away last weekend … and they walked around a park all day."  (Tr. 980)  In early April 2017, Plaintiff's back pain was moderate to severe and persistent, radiating to left arm, but her

head and chest were feeling better.  (Tr. 993)  Dr. Bergman noted that Plaintiff was "[m]ore achy today than usual in mid to low back.  Car rides on the weekend usually make her more stiff for a few days."  (Id.)  In late May, Plaintiff's back pain was moderate, radiating to her left arm, and she reported "a spasm in her mid to lower back one night recently when up caring for her 1 year old daughter[.]"  (Tr. 943)  The following week, Dr. Bergman recorded that Plaintiff's pain was eight on a ten-point scale, but the next week he characterized it as "moderate."  (Tr. 2121, 2126)

Dr. Bergman treated Plaintiff twice between June and August 2017.  (Tr. 952, 957).  Plaintiff returned to Dr. Bergman's office in September 2017 after suffering whiplash in a motor vehicle accident, for which her primary care provider prescribed morphine.  (Tr. 962-66)  Plaintiff presented to Dr. Bergman three times per month in October, November, and December 2017. (Tr. 2144, 2149, 2158-59, 2164, 2170)  In mid-October, Dr. Bergman observed that Plaintiff's "tension from the whiplash is improving," but she still had cervical pain.  (Tr. 2153)  In regard to her low back pain, Dr. Bergman wrote, "Treatment is well tolerated without complication and with good results," and her "chronic sacral tension is starting to take a different pattern," which "seems like a milestone of sorts," but she "retain[s] chronic mildly poor posture and occasional negative/victim attitude[.]"  (Id.)

Lumbar spine x-rays in late October 2017 revealed normal alignment, well-maintained disc spaces, and unremarkable facets and SI joints.  (Tr. 2063)  An MRI of her cervical spine on the same date showed "spondylitic changes C5-C6, C6-7 with very mild narrowing of the AP diameter of the canal, significant stenosis not seen" and "straightening of the normal cervical lordosis, which could be secondary to spasm or positioning."  (Tr. 2066)

In November 2017, Plaintiff's back pain was severe despite the use of morphine, and her primary care physician prescribed a fentanyl patch.  (Tr. 2076)  Later that month and twice in

13

December 2017, Dr. Bergman noted that Plaintiff's back pain was moderate.  (Tr. 2170, 2176, 2181)   Plaintiff reported exercising "some," and Dr. Bergman noted that Plaintiff's neck "responded favorably to OMT since her whiplash accident, yet she continues to have right handed numbness issues, denies weakness but numbness comes on easily, and is self-limited."  (Tr. 2181)

In December 2017, Dr. Bergman completed a medical source statement (MSS) assessing Plaintiff's ability to do work-related physical activities.  (Tr. 1908-11)  On the checklist form, Dr. Bergman opined that Plaintiff could:  occasionally lift and carry less than ten pounds; stand and/or walk a total of two hours and sit for a total of two hours in an eight-hour day; and sit fifteen minutes and stand twenty minutes before needing to change positions.  (Tr. 1908)  Dr. Bergman estimated that Plaintiff would need to get up and "walk around" twenty-five times per day for thirty minutes at a time, and she would need to lie down "every couple hours."  (Tr. 1908)  Dr. Bergman stated that Plaintiff could occasionally twist, stoop, crouch ("if has assist to rise"), and climb stairs but never climb ladders.  (Tr. 1909)  Dr. Bergman attributed the above limitations to Plaintiff's pacemaker, and related light-headedness and dizziness, and her chronic back and knee pain.  (Id.)

As to manipulative functions, Dr. Bergman opined that Plaintiff could frequently reach (although "not above head") and finger, and she could occasionally handle, feel, and push/pull with the upper and lower extremities.  (Id.)  Dr. Bergman identified the following medical findings to support those limitations:  "she has chronic pain and pre-existing thoracic outlet syndrome (brachial plexus neuropathy) and recent whiplash of the neck."  (Id.)  Dr. Bergman also noted as an additional impediment to work-related activities that Plaintiff's "anxiety flares regarding work situations[.]"  (Tr. 1910)  Dr. Bergman estimated that Plaintiff would miss more than four days of work per month, be off task 25% or more of the workday, and require hourly thirty- to forty-five-minute unscheduled breaks due to chronic fatigue, pain, numbness, and anxiety.  (Tr. 1911)

In her decision, the ALJ thoroughly reviewed Plaintiff's medical records, including Dr. Bergman's treatment notes, the treatment notes and evaluations of other primary care physicians and specialists, and the diagnostic imaging.  (Tr. 26-31)  The ALJ noted that Dr. Bergman had treated Plaintiff for approximately one year when he completed the MSS.  (Tr. 32)  The ALJ assigned "little weight" to Dr. Bergman's assessment that Plaintiff was limited to performing work at the less than sedentary level because it was inconsistent with the record as a whole.  (Id.) Specifically, the ALJ found that Dr. Bergman's opinion that Plaintiff "could only occasionally twist, stoop, crouch, and climb stairs" was "inconsistent with the claimant's presentation during the hearing" at which "she was able to stand, stoop, and twist" and "move freely."  (Id.) Additionally, the ALJ found that Plaintiff's testimony that she was "the primary caretaker of an infant (now toddler)," climbed "in and out of the pick-up truck she drives," and "did not indicate that she needed assistance loading her child into the car seat of the vehicle when she goes shopping," further undermined Dr. Bergman's opinion.  (Id.)

On review of the record, the Court finds that, while Dr. Bergman's clinical observations supported some functional limitations, they did not support the limitations identified in his MSS which, if accepted, would preclude Plaintiff from performing any work.  Nothing in Dr. Bergman's treatment notes suggested that Plaintiff was unable to either sit/stand or walk for more than two hours per day.  To the contrary, Dr. Bergman noted that Plaintiff took four-hour road trips and spent a day walking around a park.  Nor did Dr. Bergman's treatment notes support his opinion that Plaintiff could only occasionally carry less than ten pounds and that she would miss work four or more times per month, be off task 25% of more of the day, and require hourly breaks of thirty to forty-five minutes.  "An ALJ may justifiably discount a treating physician's opinion when that opinion is inconsistent with the physician's clinical treatment notes."  Martise v. Astrue, 641 F.3d

15

909, 925 (8th Cir. 2011) (quotation omitted).  See also Cline v. Colvin, 771 F.3d 1098, 1104 (8th Cir. 2014).

Furthermore, Dr. Bergman's opinion is internally inconsistent as he limited Plaintiff to no more than two hours' standing or walking per day, but opined that Plaintiff required the freedom to "walk around" twenty-five times per day for thirty minutes at a time.  (Tr. 1908)  An ALJ may assign "little weight" to a treating physician's opinion when it is internally inconsistent.  Chesser, 858 F.3d at 1164-65; Choate v. Barnhart, 457 F.3d 865, 870 (8th Cir. 2006).

Other evidence in the record also supported the ALJ's decision not to accord Dr. Bergman's opinion controlling weight.  As the ALJ noted, Plaintiff's daily activities "were not indicative of someone who is completely unable to work due to disabling pain."  Reece v. Colvin, 834 F.3d 904, 910 (8th Cir. 2016).  The ALJ noted that Plaintiff drove a truck, lived independently while caring for a toddler, and shopped for groceries.  In her function report, Plaintiff admitted that she prepared simple meals such as sandwiches, did small loads of laundry, and cleaned a limited number of dishes, and she was able to walk "maybe ½ mile" before needing to rest.  (Tr. 326, 329)  "Evidence of daily activities that are inconsistent with allegations of disabling pain may be considered in judging the credibility of such complaints."  Id. (citing Dunahoo v. Apfel, 241 F.3d 1033, 138-39 (8th Cir. 2001)).

Importantly, the ALJ did not entirely discount Dr. Bergman's opinion.  Rather, the ALJ found that Plaintiff had the RFC to perform a limited range of light work.  The ALJ accounted for the impairments affecting Plaintiff's legs, back, and neck by including restrictions to occasional stooping, kneeling, crouching, crawling, and climbing stairs or ramps. The ALJ accounted for Plaintiff's upper extremity symptoms with limitations to occasional overhead reaching, frequent reaching in all other directions, and frequent handling.

16

Plaintiff asserts the ALJ erred in discounting Dr. Bergman's opinion relating to absenteeism and time off task because it "goes to an issue reserved to the Commissioner."  (Tr. 32)  As Plaintiff correctly points out, "[t]hese are *not* summary conclusions that Plaintiff cannot work that are reserved to the commissioner by CFR [§§] 404.1527(d) and 416.927(d)."  [ECF No. 18 at 15]  The Court agrees with Plaintiff that Dr. Bergman's opinions relating to absenteeism and time off task were proper medical opinions under the regulations.  See, e.g., Gude v. Berryhill, No. 2:16-CV-79 SPM, 2018 WL 1470455, at *3-4 (E.D. Mo. Mar. 26, 2018) (the ALJ erred in rejecting the treating physician's opinion regarding the plaintiff's potential absenteeism).   Although the ALJ did not provide a "good reason" for discounting Dr. Bergman's opinion relating to absenteeism and time off task, the Court finds that the error was harmless because that opinion was not supported by his treatment notes.

Plaintiff also argues that Dr. Bergman's opinion deserved more weight because it was consistent with that of the consulting examiner, Dr. Pryor.  Dr. Pryor examined Plaintiff and reviewed her medical records in January 2016.  (Tr. 878-88)  On examination, Dr. Pryor observed that Plaintiff was cooperative and able to communicate without deficits, and displayed intact recent and remote memory, appropriate cognition, and good insight. (Tr. 881)  Plaintiff had 5/5 strength in the upper and lower extremities, but she exhibited tenderness in her spine and increased lumbar lordosis, decreased range of motion in her shoulders and cervical and lumbar spine, and TMJ with audible clicking upon opening and closing jaw.  (Tr. 881-82)  Plaintiff's gait was steady, and she was able to rise without assistance, stand on toes and heels, and tandem walk.  (Tr. 882)  Dr. Pryor did not assess Plaintiff's lifting ability because she was pregnant.  (Id.)  Dr. Pryor opined that Plaintiff was able to:  walk twenty minutes at a time for a total of two hours per day; stand twenty minutes at a time for a total of two hours per day; sit twenty-five minutes at a time for a total of

three hours per day; occasionally stoop, bend, or climb; and balance, push/pull light objects, use hand and foot controls, and handle small objects. (Tr. 885)

In her decision, the ALJ gave Dr. Pryor's opinion little weight, reasoning that "his opinion is inconsistent with the claimant's own reports of her ability." (Tr. 31) The ALJ explained: "For example, while Dr. Pryor opined that the claimant could only sit for a total of two hours daily, during the hearing she testified that she was able to sit for between four to six hours total during an out of town trip." (Id.) "An ALJ may discount a treating physician's opinion when it is inconsistent with a plaintiff's activities of daily living." Johnson v. Berryhill, 4:16-CV-1114 NCC, 2017 WL 4280674, at *4 (E.D. Mo. Sep. 27, 2017). As with Dr. Bergman's MSS, the ALJ incorporated some of Dr. Pryor's opined limitations and rejected those that were overly extreme and not supported by the record as a whole. Upon review, the Court finds that the ALJ properly evaluated both Dr. Pryor's and Dr. Bergman's medical opinions and provided "good reasons" for assigning them little weight.

### 2. Dr. Elder

Plaintiff also challenges the ALJ's decision to assign little weight to the opinion of her treating psychiatrist Dr. Elder. Plaintiff began receiving mental health treatment at MU Health Care's South Providence Psychiatry Clinic in January 2017.[4] (Tr. 1587) At her initial evaluation, the psychiatrist completed a mental status examination, noting that Plaintiff: was alert and appeared to be "of average intellectual functioning"; had clear and coherent speech "with normal rate[,] volume and tone although she is somewhat circumstantial at times in her responses"; demonstrated logical and goal-directed thoughts and fair insight/judgment; and displayed a

---

[4] Prior to January 2017, Plaintiff received therapy from Tracy Parks, LPC and medication management from Drs. Gillette and Cummins at Complete Family Medicine. (Tr. 494-699, 750-843)

"relatively bright" affect "although she describes her mood as anxious primarily as well as angry/irritable." (Tr. 1590)  The psychiatrist diagnosed Plaintiff with unspecified mood disorder, prescribed Effexor, and increased the dosage the following month. (Tr. 1590)

When Plaintiff returned to the psychiatry clinic in March 2017, she stated that her mood was "usually pissed off" and reported sporadic, passive suicidal ideation, but her mental status examination reflected:  appropriate clothing and good grooming; cooperative/friendly, good eye contact; affect congruent to mood, euthymic and appropriate to content of conversation; normal speech, thought process, thought flow, memory, and concentration; and no evidence of delusions/paranoia. (Tr. 1599)  The psychiatrist diagnosed Plaintiff with PTSD, unspecified anxiety disorder, and unspecified disruptive conduct and impulse-control disorder. (Id.)

When Plaintiff followed up at the psychiatry clinic in May 2017, she reported "no difference in her anxiety and irritability, but denies frank depressive mood ('I still don't feel anything') and does attest to letting go of some arguments rather than escalating them." (Tr. 1605)  Plaintiff was "friendly and cooperative" and denied suicidal ideation. (Id.)  Plaintiff's mental status examination was essentially the same as her March visit, and the psychiatrist increased her Effexor and, a few weeks later, increased her gabapentin and prescribed prazosin. (Tr. 1607, 1623)

When Plaintiff returned to the psychiatry clinic in June 2017, she reported "continued anxiety with somatic sx (lump in the throat, some SOB)" and sporadic passive suicidal ideation, "but [she] does feel like her mood has improved – although still maintains that she 'doesn't feel.'" (Tr. 1621)  Plaintiff's mental status exam revealed:  appropriate clothing and grooming; cooperative/friendly, good eye contact; mood "nothing"; affect "incongruent to mood, euthymic, full-range, increased intensity, appropriate to content of conversation"; normal speech and thought process, flow, and content; fair judgment; and limited insight. (Tr. 1623)  The psychiatrist

19

recommended mood tracking, started buspirone titration, continued the maximum dose of venlafaxine, and stopped prazosin. (Tr. 1623)

Dr. Elder treated Plaintiff at the psychiatry clinic in August 2017. (Tr. 1633) Plaintiff complained that her "biggest issue is her anxiety" and "she does not feel like buspar is helping at all." (Tr. 1633) Plaintiff also reported sporadic sleep and nighmares. (Id.) On examination, Dr. Elder observed:  behavior calm and cooperative; hygiene, grooming, and eye contact fair; speech fluent with normal rate, rhythm, and tone; mood "anxious"; affect "mildly irritable, but generally euthymic and stable, decent range and reactivity"; linear thought flow; organized thought process; limited  insight and judgment; and normal cognition and memory. (Tr. 1634) Dr. Elder diagnosed Plaintiff with PTSD, unspecified anxiety disorder, and "other specified personality disorder (BPD traits; r/o ASPD traits)." (Tr. 1635) Dr. Elder continued venlafaxine and buspirone and prescribed mirtazapine for sleep, anxiety, and depression.  (Id.)

When Plaintiff followed up with Dr. Elder in September 2017, she reported continued sleep problems and more nightmares, and she had stopped taking Remeron for sleep because it made her sleepwalk. (Tr. 1659) Plaintiff also complained of increased irritability and stress, which she attributed to her upcoming disability hearing, and her mental status examination was essentially the same as that of the previous month.  (Tr. 1660-61)  Dr. Elder continued venlafaxine and buspirone, stopped mirtazapine, and prescribed clonidine for sleep.  (Tr. 1662)

In October 2017, Plaintiff saw a different psychiatrist at the clinic. (Tr. 1887)  Plaintiff reported that her symptoms were worse, and stated, "I just want to give up, I don't care anymore." She denied feeling either depressed or "overwhelmed as a parent," but reported, "I don't feel anything." (Id.)  She also described "high irritability, and it seems to go with her anxiety." (Tr.

1887)  The psychiatrist continued Plaintiff's Effexor and clonidine, increased buspar, and ordered "neuropsych testing for clarification of her diagnosis."  (Tr. 1889)

Plaintiff saw Dr. Elder in December 2017 and complained of worsening anxiety and poor mood and sleep.  (Tr. 1956)  Dr. Elder noted:  "She did however, seem calmer and pleased after provider filled out [disability] paperwork during the interview."  (Id.)  Plaintiff expressed interest in trying Xanax or valium, and "was not happy when the conversation was changed to the alternatives and going up on the buspar."  (Tr. 1957)  On examination, Dr. Elder observed that Plaintiff:  "smiles easily, somewhat stressed, but relaxed at times"; fair hygiene, grooming, and eye contact; generally euthymic and stable affect; organized thought process; adequate attention and concentration; limited insight and judgment; average intellect; and normal cognition and memory.  (Tr. 1958-59)  Dr. Elder continued Plaintiff's Effexor and increased her clonidine and buspar.  (Tr. 1959)

On the same day, Dr. Elder completed an MSS assessing Plaintiff's ability to do work-related mental activities.   On a checklist form, Dr. Elder opined that Plaintiff had:  extreme limitations on her ability to carry out complex instructions and make judgments on complex, work-related decisions; marked limitations on her ability make judgments on simple work-related decisions; moderate limitations on her ability to understand and remember complex instructions and carry out simple instructions; and mild limitations on her ability to understand and remember simple instructions.  (Tr. 1903)  In regard to social functioning, Dr. Elder assessed:  extreme limitations on interacting appropriately with supervisors; marked limitations on interacting appropriately with coworkers; and moderate limitations on interacting appropriately with the public and responding appropriately to usual work situations and changes in a routine work setting. (Tr. 1904)  Dr. Elder stated that Plaintiff's impairments caused "mood instability, difficulty with

21

interpersonal relationships, anger/irritability episodes, dissociative episodes." (Tr. 1904) He also opined that Plaintiff would be absent from work more than four days per month and off task 25% or more of the workday. (Id.)

The ALJ reviewed Plaintiff's mental health treatment records, as well as Dr. Elder's MSS, and concluded "the doctor's opinion is not consistent with the overall evidence of record." (Tr. 32) The ALJ explained:

> For example, although Dr. Elder opined that the claimant had extreme limitations in the area of interpersonal relationships, throughout the record and during the hearing, the claimant stated that she has been able to maintain a long-term relationship, go out in public, navigate public roadways for lengthy periods of time without incident, visit family and friends on these trips, shop by herself with her child, and spend the day at the park.

(Id.) The ALJ further observed that Dr. Elder "issued his opinion primarily in the form of a checklist, which is not as persuasive as an in-depth analysis that discusses the basis behind the opinion." (Id.) The ALJ therefore assigned Dr. Elder's MSS "little weight."

At the outset, the Court notes that, although the ALJ assigned Dr. Elder's MSS "little weight," the ALJ included significant mental limitations in the RFC. Specifically, the ALJ limited Plaintiff to: remembering and carrying out simple, routine tasks and making simple work-related decisions; no production pace tasks that required strict hourly goals; frequent contact with supervisors and coworkers; and only occasional contact with the general public. The ALJ added that Plaintiff would be off task five percent of the workday. These limitations account for Dr. Elder's opinion that Plaintiff had difficulty remembering and carrying out instructions and making work-related decision. See, e.g., Karahodzic v. Saul, No. 4:19-CV-797 SEP, 2020 WL 5632451, at *5 (E.D. Mo. Sep. 21, 2020).

The ALJ reasonably found, however, that the limitations in Dr. Elder's MSS relating to Plaintiff's social functioning were not supported by his treatment notes or elsewhere in the record.

"[A]n ALJ may discount a treating source opinion that is unsupported by treatment notes." Aguiniga v. Colvin, 833 F.3d 896, 902 (8th Cir. 2016). See also Denton v. Berryhill, No. 1:16-CV-253 PLC, 2018 WL 4358262, at *5-6 (E.D. Mo. Sep. 13, 2018) ("[C]ourts have held that normal findings pursuant to a mental status examination are a sufficient basis upon which an ALJ may discredit a treating doctor's opinion that a claimant is disabled.")

While Dr. Elder and his colleagues at the psychiatry clinic consistently noted Plaintiff's limited insight and judgment and self-reported anxious and/or irritable mood, Plaintiff's mental status examinations regularly reflected:  friendly, cooperative behavior; good eye contact; euthymic affect; appropriate grooming and attire; and normal speech, thought process, concentration, and memory.  Thus, while Dr. Elder's treatment notes reflected some limitations in Plaintiff's ability to function, they did not support the extreme limitations identified in the MSS. See e.g., Young v. Saul, 4:19-CV-3345 SEP, 2021 WL 2255001, at *9 (E.D. Mo. June 3, 2021); Couch v. Berryhill, No. 2:18-CV-46 DDN, 2019 WL 1992623, at *7 (E.D. Mo. Mar. 6, 2019). Consistent with the treatment notes, the ALJ limited Plaintiff to frequent contact with supervisors and coworkers and occasional contact with the general public.

The ALJ properly considered other evidence in the record that was inconsistent with Dr. Elder's opinion that Plaintiff's mental impairments were disabling.  For example, the ALJ noted that Plaintiff was able to be the primary caregiver to her young daughter, maintain long-term relationships, travel to visit friends and family, and shop.  "An ALJ may discount a treating physician's opinion when it is inconsistent with a plaintiff's activities of daily living." Johnson, 2017 WL 4280674, at *4.  See also Couch, 2019 WL 1992623, at *8.

The ALJ also discounted Dr. Elder's opinion because it was "in the form of a checklist, which is not as persuasive as an in-depth written analysis that discusses the basis behind the

23

opinion."  (Tr. 32)  A provider's checkmarks on a form are conclusory opinions that can be discounted if, as is the case here, they are contradicted by other objective medical evidence. Johnson v. Astrue, 628 F.3d 991, 992 (8th Cir. 2011).  See also Thomas v. Berryhill, 881 F.3d 672, 675 (8th Cir. 2018) (giving little weight to a medical opinion consisting of checked boxes, circled answers, and brief fill-in-the-blank responses without medical evidence and providing little to no elaboration).

Additionally, the Court notes that Plaintiff's mental health symptoms were managed with therapy and medication.  Based on the records, it does not appear that Plaintiff was referred to intensive outpatient treatment, inpatient hospitalization, or other intensive treatment measures. Plaintiff's conservative course of treatment belies the limitations identified in Dr. Elder's opinion. See Reece, 834 F.3d at 909  (ALJ properly considered a treating physician's "routine, conservative medical treatment" in discounting treating physician's opinions); Perkins, 648 F.3d at 898-99 (holding that an ALJ properly discounted a treating physician's opinion where, among other flaws, the treating physician's opinion was inconsistent with the conservative nature of the treatment rendered).

As with Dr. Bergman's opinion, the ALJ erred in discounting Dr. Elder's opinion relating to Plaintiff's expected absenteeism and time off task on the ground that "it involves non-medical issues that are not of the expertise of the medical professional."  Contrary to the ALJ's statement, a medical source may assess a patient's potential absenteeism, and it is proper for the ALJ to consider that opinion.  See, e.g., Gude, 2018 WL 1470455, at *3-4 (the ALJ erred in rejecting the treating physician's opinion regarding the plaintiff's potential absenteeism).  The Court finds, however, that the ALJ properly disregarded Dr. Elder's opinion relating to absenteeism because it was not supported by the treatment notes.  There was no evidence that plaintiff was frequently late

24

to or failed to show up for her appointments with Dr. Elder or any other providers.  See, e.g., Morris v. Berryhill, No. 1:17-CV-212 NCC, 2019 WL 11229990, at *10 (E.D. Mo. Mar. 12, 2019) (the treating psychiatrist's treatment notes did not support his opinion relating to the plaintiff's absenteeism).  Nor did Plaintiff's mental health records reflect deficiencies in Plaintiff's attention and concentration that would cause her to be off task 25% of the workday.  Upon review of the record, the Court finds that the ALJ properly evaluated Dr. Elder's opinion and provided "good reasons" for assigning it little weight.

**C.  RFC**

Plaintiff claims that the ALJ's RFC determination "is not supported by any medical opinion and she impermissibly drew on her own inferences from the medical record." [ECF No. 18 at 17] Plaintiff further argues that the ALJ's RFC assessment did not comply with SSR 96-8p.[5]  In response, the Commissioner asserts that the ALJ properly weighed medical opinion evidence to evaluate the RFC, assigned significant limitations to account for Plaintiff's impairments, and identified sufficient evidence to support her findings.  [ECF No. 23 at 4]

"RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996).  "[A] claimant's RFC [is] based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his limitations."  Moore, 572 F.3d at 523 (quotation and citation omitted).  "Because a claimant's RFC is a medical question, an

---

[5] SSR 96-8p requires that an ALJ provide "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996).

ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016) (quoting Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007)).  However, "there is no requirement that an RFC finding be supported by a specific medical opinion." Id. (citing Myers v. Colvin, 721 F.3d 521, 526-27 (8th Cir. 2013)).

So long as an ALJ adequately explains the underlying evidentiary basis for her RFC determination, as she did in this case, she has satisfied the demands of SSR 96-8p.   After thoroughly reviewing Plaintiff's medical records, the ALJ reached a determination regarding Plaintiff's RFC that did not precisely mirror any of the medical opinions in the record.  This decision was entirely within the ALJ's discretion, because "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." Martise, 641 F.3d at 927 (quoting Schmidt v. Astrue, 496 F.3d 833, 845 (7th Cir. 2007)).  "Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." Cox, 495 F.3d at 619.

Citing Biegel v. Berryhill, 2:17-CV-40 SPM, 2018 WL 4636091 (E.D. Mo. Sep. 27, 2018), Plaintiff argues that the RFC is not supported by substantial evidence because the ALJ gave little weight to the three medical opinions of record and "this case does not involve generally mild or unremarkable findings." [ECF No. 18 at 19] Biegel is inapposite.  In that case, the court found that the ALJ "did not conduct an adequate assessment of [the treating physician's] opinion under the regulations and did not offer good reasons for his decision to discount it completely." Id. at *4.  The court further found that there was not substantial evidence to support the ALJ's physical RFC determination because, aside from the medical opinion that the ALJ "discredited in its

entirety," there was "no medical opinion evidence in the record regarding Plaintiff's physical ability to function in the workplace." Id. at 8.

Unlike the ALJ in Biegel, the ALJ here did not entirely discredit the medical opinions of record. Instead, the ALJ assigned them little weight but nevertheless incorporated many, but not all, of the limitations identified by the doctors. This case is also distinguishable from Biegel in that the ALJ provided a narrative discussion explaining how the evidence in the record led her to conclude that Plaintiff was capable of performing a limited range of light work. In this case, The ALJ properly considered Plaintiff's chronic pain, migraines, and post-pacemaker status, provided good reasons for finding that Plaintiff's subjective reports were less than fully credible, and explained the weight assigned to the medical opinion evidence. See, e.g., Akridge v. Saul, No. 1:18-CV-244 SNLJ, 2020 WL 1332072, at *6 (Mar. 23, 2020).

Plaintiff briefly suggests that the ALJ's RFC determination was not supported by substantial evidence because it did not address "Plaintiff's credible side effects of necessary medications[.]"  [ECF No. 18 at 18]  However, Plaintiff does not identify any side effects that would impair her ability to function in the workplace.[6]  Nor did Plaintiff testify to the alleged side effects of her medications at the administrative hearing.

Finally, Plaintiff faults the ALJ for "not tak[ing]into consideration" that Plaintiff "was seen by various doctors for her multiple physical and mental health conditions on 197 visits" between

---

[6] In the section of her function report asking Plaintiff to list her medications and their side effects, Plaintiff listed only "trazodone 100 mg, slug[gish], dro[w]zy" and Latuda 20 mg, none." Plaintiff discontinued trazodone in October 2015.  (Tr. 765)  In her later medical records, her only complaints of side effects were to sleep medications that caused nightmares and/or sleepwalking, and it appears that her doctor resolved these problem by adjusting her medications.  (See Tr. 1659-62, 1889, 1959-60)

August 2015 and December 2017.  [EF No. 18 at 18]  Plaintiff appears to argue that the frequency of her medical appointments warrants a more restrictive RFC finding.

There is no question that the record reflects that, even setting aside the doctor visits specific to pregnancy, Plaintiff attended frequent medical appointments.  However, "simply because a [plaintiff] requires regular healthcare appointments does not necessarily mean [she] cannot work on the days [she] has appointments, such as by arranging appointments around the work schedule or during breaks, nor even that the [plaintiff] would need to miss an entire work day for an appointment."  Nicole L. v. Kijakazi, No. 20-CV-2326 MJD/LIB, 2022 WL 479360, at *6 (D. Minn. Jan. 31, 2022) (alterations in original) (quoting Morin v. Colvin, No. 4:14-cv-000769-NKL, 2015 WL 4928461, at *9 (W.D. Mo. Aug. 18, 2015)).  If a plaintiff "contends [her] medical appointments would necessarily conflict with a work schedule, it is [her]burden to demonstrate that."  Id. (quoting Brown v. Saul, No. C18-3071-LTS, 2020 WL 1467044, at *9 (N.D. Iowa Mar. 26, 2020)).  In this case, Plaintiff has not met her burden of demonstrating that the ALJ erred by not including in the RFC limitations based on the frequency of her medical appointments.  See Jeffries v. Berryhill, No. 4:16-CV-18 JMB, 2017 WL 365439, at *6 (E.D. Mo. Jan. 25, 2017).  The Court therefore defers to the ALJ's determination, which was supported by substantial evidence.

**VI.    Conclusion**

For the reasons discussed above, the Court finds that substantial evidence in the record as a whole supports the Commissioner's decision that Plaintiff was not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of Defendant denying Social Security benefits to Plaintiff is **AFFIRMED**.

A separate judgment in accordance with this Memorandum and Order is entered this date.

_____

PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 10th day of March, 2022